FILED

2010 Oct-18  AM 08:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| STEPTOE HOMES, INC., a Nevada corporation; INSPIRATION HOMES, LLC, a Nevada limited liability company; RAINEY DAY INVESTMENTS, LLC, a Nevada limited liability company; DRS TRUST; DRS HOLDINGS, LLC, a Nevada limited liability company; DONALD MARK BIVINS, an individual; THERESA BIVINS, an individual; AND MARK A. RUA, an individual; | |
| Plaintiffs, | Case No.: _____ |
| vs. | |
| NEW SOUTH FEDERAL SAVINGS BANK; BEAL BANK, SSB, AS SUCCESSOR IN INTEREST TO NEW SOUTH FEDERAL SAVINGS BANK; and FEDERAL DEPOSIT INSURANCE CORPORATION, IN ITS CAPACITY AS RECEIVER FOR NEW SOUTH FEDERAL SAVINGS BANK, | |
| Defendants. | |

## COMPLAINT

Steptoe Homes, Inc.; Inspiration Homes, LLC; Rainy Day Investments, LLC; DRS Trust; DRS Holdings, LLC; Donald Mark Bivins; Theresa Bivins; and Mark A. Rua (hereinafter collectively "Plaintiffs"), hereby complain and allege against the Defendants as follows:

{B1216682}                                  1

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action, and venue lies in this District, pursuant to 28 U.S.C. §§ 1331, 1332, 1391, 2201, and 2202 and 12 U.S.C. § 1819(b)(2)(A).

2. Specifically, (i) Defendant New South Federal Savings Bank ("NSF"), now in receivership, at all relevant times maintained its principal place of business and headquarters in Irondale, Alabama, within this judicial district; (ii) a substantial part of the events giving rise to the claims in this action occurred in this judicial district; and (iii) Defendants in this action are/were subject to personal jurisdiction within this judicial district at the time this action was commenced.

3. There exists an actual controversy in excess of $75,000 within this Court's jurisdiction. The parties are also entitled to a declaration of their respective rights and other legal relations.

## PARTIES

4. Plaintiff, Steptoe Homes, Inc. (hereinafter "Steptoe") is, and was at all times relevant herein, a Nevada corporation, doing business in Clark County, Nevada. Steptoe's principal place of business is located in Nevada. Accordingly, Steptoe is a citizen of the State of Nevada.

5. Plaintiff, Inspiration Homes, LLC (hereinafter "Inspiration") is and at all times relevant herein was a limited liability company formed in accordance with the laws of the State of Nevada, doing business in Clark County, Nevada. The sole member of Inspiration is the Donald Mark Bivins Family Trust. The trustee and all beneficiaries of the Donald Mark Bivens Family Trust are citizens of the State of Nevada. Therefore, Inspiration is a citizen of the State of Nevada.

6.     Plaintiff Rainey Day Investments, LLC (hereinafter "RDI") is and at all times relevant herein was a limited liability company formed in accordance with the laws of the State of Nevada, doing business in Clark County, Nevada. RDI's sole member is Mark Rua who is a Nevada citizen. Accordingly, RDI is a citizen of the State of Nevada.

7.     Plaintiff DRS Trust is and was at all times relevant herein a trust formed under and in compliance with the laws of the State of Nevada. The trustee and all beneficiaries of the DRS Trust are citizens of the State of Nevada. Therefore, DRS Trust is a citizen of the State of Nevada.

8.     Plaintiff DRS Holdings, LLC (hereinafter "DRS Holdings") is and was at all times relevant herein a limited liability company formed in accordance with the laws of the State of Nevada, doing business in Clark County, Nevada. DRS Holdings' sole member is DRS Diversified, LLC. DRS Diversified, LLC's sole member is the DRS Trust which, for purposes of jurisdiction, is a Nevada citizen. Accordingly, DRS Holdings is a citizen of the State of Nevada.

9.     Plaintiff Donald Mark Bivins (hereinafter "Donald Bivins") is and was at all times relevant herein a resident and citizen of the State of Nevada.

10.     Plaintiff Theresa Bivins (hereinafter "Theresa Bivins") is and was at all times relevant herein a resident and citizen of the State of Nevada.

11.     Plaintiff Mark Rua (hereinafter "Rua") is and was at all times relevant herein a resident and citizen of the State of Nevada.

12.     Defendant NSF is a failed banking institution closed by the Office of Thrift Supervision ("OTS") on December 18, 2009, and for which the Federal Deposit Insurance Corporation ("FDIC") was named Receiver. Defendant NSF was a federal savings bank with activities sufficiently

localized in Alabama. Defendant NSF transacted significant business within the State of Alabama and maintained its home office and principal place of business within the State of Alabama.

13.     Defendant Beal Bank, SSB ("Beal") is a lending institution and successor in interest to NSF. Beal is a Texas corporation, a Texas State Financial Institution, with its principal place of business in Texas.

14.     Defendant Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver for NSF and in that capacity is a defendant herein.

## FACTS

### THE DEVELOPMENT LOAN AGREEMENT

15.     On or about July 12, 2005, Steptoe entered into a loan agreement with NSF, evidenced by a Promissory Note of same date (the "Original Note").

16.     Pursuant to the terms of the Note, NSF agreed to lend Steptoe the principal sum of $5,869,720.00 for the purposes of developing residential real property in Las Vegas, Nevada (the "Development Loan").

17.     The term of the Original Note was 24 months, at which time all principal and all accrued and unpaid interest was due and payable.

18.     The Development Loan, and Steptoe's obligations thereunder, were secured by a Deed of Trust (the "Original Trust Deed") and Fixture Filing, recorded on or about July 15, 2005, with the County Recorders Office for Clark County, Nevada, as Document No. 20050715-0004224.

19.     The Original Trust Deed encumbered certain real property in Clark County, Nevada, described as Assessor Parcel Nos. ("APN"): 167-27-

211-002, 167-27-211-003, 161-27-211-004, 167-27-610-001, 161-27-610-008, 161-27-610-002, and 161-27-610-009.

20.    The Original Note and Steptoe's obligations thereunder were further secured by a "Specific Guaranty" (the "Original Guaranty"), executed by Donald Bivens, Theresa Bivins, Rua, and Inspiration (collectively the "Guarantors").

**FIRST MODIFICATION TO THE DEVELOPMENT LOAN**

21.    In or around April 2007, Steptoe and NSF agreed to modify the terms of the Development Loan (the "First Modification").

22.    As a result of the First Modification, NSF increased the principal amount of the Development Loan to $9,400,000.00; additionally, the maturity date of the Original Note was extended an additional 24 months as a result of the First Modification.

23.    As a further part of the First Modification, DRS Trust was added as an additional guarantor of Steptoe's obligations under the Development Loan (hereinafter DRS Trust shall be included as a "Guarantor").

**SECOND MODIFICATION TO THE DEVELOPMENT LOAN**

24.    On or about January 29, 2009, Steptoe and NSF entered into an agreement to again modify the terms of the Development Loan, as amended by the First Modification (the "Second Modification").  In the Second Modification multiple terms were included.  First, the principal amount of the Development Loan was revised to $8,460,000.00.  Second, because $3,477,152.00 the total amount of the Development Loan was then unfunded, the unfunded portion of the Development Loan was allocated and

applied as follows: (i) $2,463,500.00 was used to pay off another loan between NSF and Steptoe; (ii) $413,652.00 was put aside to establish an "interest reserve" for the Development Loan; and (iii) up to $600,000.00 was allocated to Steptoe for completion of the "Unit 1 Development".

25.    As part of the Second Modification, NSF demanded additional collateral and assurances by Steptoe and/or the Guarantors.  Specifically, NSF demanded and received the following collateral as additional security for the Second Modification (the "Additional Collateral") from Steptoe and the Guarantors: (i) Five acres of vacant land held by Steptoe in Clark County, Nevada, described as APN 167-27-610-013 and 167-27-610-014; (ii) Three completed model homes held by Steptoe in Clark County, Nevada, described as APN 167-27-620-009, 167-27-620-010, 167-27-620-011; (iii) Eighteen plotted lots consisting of approximately 3.86 acres in Clark County, Nevada, held jointly by Rainy Day Investments, LLC, a Nevada limited liability company, and DRS Holdings, LLC, a Nevada limited liability company, described as APN 160-33-701-001; and (iv) Two improved residential properties held by Inspiration Homes, LLC, in Clark County, Nevada, described as APN 178-30-614-006 and 178-30-220-004.

26.    Based upon NSF's representations that it would perform under the terms of the Development Loan and the Original Note (as amended by the First and Second Modifications), Steptoe, the Guarantors, Rainy Day Investments, LLC, and DRS Holdings, LLC, agreed to pledge the Additional Collateral.

## THE CONSTRUCTION LOAN

27.   On or about March 31, 2009, Steptoe entered into a separate loan agreement with NSF, evidenced by a Promissory Note of same date (the "Construction Note").

28.   Pursuant to the terms of the Construction Note, NSF agreed to lend Steptoe the principal sum of $1,062,750.00 (the "Construction Loan"). The term of the Construction Note was 12 months, at which time all principal and all accrued and unpaid interest was due and payable.

29.   The Construction Loan, and Steptoe's obligations thereunder, were secured by a Deed of Trust (the "Construction Trust Deed") and Fixture Filing with Assignment of Rents, recorded on or about April 3, 2009, with the County Recorders Office for Clark County, Nevada, as Document No. 20090403-002172.   The Construction Trust Deed encumbered certain real property in Clark County, Nevada, described as Assessor Parcel Nos. ("APN"): 161-27-620-015, 161-27-620-017, 161-27-620-018, 161-27-620-039, 161-27-620-040, 161-27-620-041, and 161-27-620-042 (collectively considered part of the "Additional Collateral," as defined hereinabove).

30.   The Construction Loan and the obligations thereunder were further secured by a "Specific Guaranty" (the "Construction Guaranty") executed by Donald Bivins, Theresa Bivins and Rua.

## THE FAILURE OF SILVERTON BANK

31.   Upon information and belief, Silverton Bank, N.A. ("Silverton"), was a substantial participant in the Loan, holding at least a 25%-30% interest therein.

32.    On or about February 26, 2009, the Department of the Treasury, Office of the Comptroller of the Currency ("OCC"), issued a "Consent Order," recognizing Silverton's potential for imminent failure.

33.    On or about May 1, 2009, Silverton was closed by the OCC, and the FDIC was appointed Receiver.

## THE FAILURE OF NEW SOUTH FEDERAL SAVINGS BANK

34.    On or about May 15, 2009, the OTS issued an "Order to Cease and Desist" against NSF, pursuant to a "Stipulation and Consent to Issuance of Order to Cease and Desist" executed by NSF.

35.    Pursuant to the "Stipulation And Consent To Issuance Of Order To Cease And Desist," it was recognized that the OTS, as part of a September 2, 2008 Report Of Examination of NSF, determined, in part, that NSF "has engaged in unsafe and unsound banking and lending practices related to the origination, oversight, and administration of its residential speculative construction, . . . ."

36.    On or about November 10, 2009, the OTS issued a "Prompt Corrective Action Directive" against NSF, pursuant to a "Notice of Intent to Issue Prompt Corrective Action Directive" dated on or about October 30, 2009.

37.    On or about December 18, 2009, the OTS closed NSF and the FDIC was appointed Receiver.

38.    At or near the time that NSF was closed, NSF's assets were transferred to Beal as NSF's successor in interest.

39.    Plaintiffs submitted a Proof of Claim arising from NSF's conduct with the FDIC.   However, by correspondence dated August 17, 2010, the FDIC disallowed Plaintiff's Proof of Claim.

40.    As a result of the FDIC's disallowance of Plaintiff's Proof of Claim, this lawsuit is authorized pursuant to 12 U.S.C § 1821(d)(6) arising from NSF's conduct.

## NEW SOUTH FEDERAL SAVINGS BANK'S CONDUCT IN INDUCING THE SECOND MODIFICATION AND THE CONSTRUCTION LOAN

41.    In January and February of 2009, before Plaintiffs pledged the Additional Collateral in connection with the Second Modification and Construction Loan, Bob Kane as a representative of NSF represented to Mark Bivens and Steptoe that NSF would fully fund both the Development Loan and the Construction Loan through development of the Project.

42.    On behalf of NSF, Kane affirmatively represented that NSF would fully fund both the Development Loan and the Construction Loan.

43.    Upon information and belief, NSF instructed Kane to make the representations to Bivens and Steptoe and that NSF would fully fund the Development Loan the Construction Loan.

44.    NSF's representations were expressly made to induce Plaintiffs to pledge the Additional Collateral.

45.    Plaintiffs relied on the representations of NSF and pledged the Additional Collateral in support of the Construction Loan and Development Loan.

46.     At the time of NSF's representations, NSF knew or should have known that it would not fully fund either the Development Loan or the Construction Loan because both NSF and Silverton Bank were under regulatory scrutiny and in imminent danger of failure.

47.     Had NSF not made the representations that it would fully fund the Development Loan and the Construction Loan, Plaintiffs would not have pledged the Additional Collateral and would have sought to secure alternative financing with another more viable lending institution.

48.     NSF knew or should have known of Silverton Bank and NSF's impending failure at the time of the Second Modification and Construction Loan.

49.     NSF had a duty to disclose to Plaintiffs the impending failures of Silverton Bank and NSF before the Second Modification, Construction Loan, and the pledge of Additional Collateral.

50.     To induce the pledge of Additional Collateral by Plaintiffs, NSF willfully suppressed the critical information about Silverton Bank and NSF's impending failures.

51.     In July 2009, NSF revealed to Plaintiffs the truth about the circumstances of NSF when Steptoe met with Ben Dishman ("Dishman") and Gary Crump ("Crump"), representatives of NSF.

52.     During the foregoing meeting, Dishman and/or Crump informed Steptoe that NSF would not be an on-going source of financing for future projects.  Further, Dishman and/or Crump indicated that NSF was likely to be shutdown in the near future by the OTS.

53.    In about August 2009, NSF informed Steptoe that all NSF funding commitments had been cancelled and that NSF would no longer pay amounts due on the Development Loan from the "interest reserve" set up pursuant to the Second Modification.

54.    Dishman subsequently informed Steptoe that NSF had cancelled its commitments because it had unilaterally decided that the collateral securing the Development Loan and/or the Construction Loan was insufficient to secure the Development Loan and/or the Construction Loan. The evidentiary basis for NSF's unilateral valuation of the underlying collateral has never been provided.

55.    In a correspondence dated October 5, 2009, NSF declared the Development Loan and the Construction Loan in default.

56.    As a result of the failure of NSF and transfer of its assets to Beal Bank, Plaintiffs have reason to believe that Beal Bank, as successor-in-interest to NSF by way of FDIC as Receiver, intends to pursue an action against Plaintiffs to recover amounts allegedly due under the Development Loan and/or the Construction Loan.

## COUNT I
### (Breach of Contract Against NSF)

57.    Plaintiffs repeat and reallege each and every allegation contained above and incorporate the same by reference.

58.    Steptoe entered into loan agreements with NSF relative to the Development and Construction Loans.

59.    Pursuant to the loan agreements relative to the Development and Construction Loans, NSF agreed to lend Steptoe specific sums for the

purposes of development and construction of real property in Las Vegas, Nevada.

60.     Plaintiffs satisfied all conditions precedent to and relative to the Development and Construction Loans.

61.     NSF materially breached its commitment(s) and obligation(s) under the Development Loan when it refused to apply monies from the "interest reserve" towards payment of amounts due by Steptoe from the Development Loan, and/or otherwise failed or refused to honor its commitment(s) to Steptoe under both the Development and the Construction Loans.  As a result of said breaches, Steptoe has incurred costs and losses including, but not limited to, lost profits and opportunities.

62.     As a direct and proximate result of NSF's material breaches, Plaintiffs have been damaged in an amount in excess of $75,000.00, plus interest thereon.

63.     As a direct and proximate result of NSF's material breaches, any remaining performance by the Plaintiffs relative to the Development and Construction Loans has been excused or prevented.

64.     Plaintiffs have been forced to retain the services of an attorney to prosecute this matter and are entitled to receive reasonable costs and attorney's fees incurred herein as special damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demand judgment against NSF; Beal, as successor-in-interest to NSF; and FDIC, as receiver of NSF, and Plaintiffs demand compensatory damages in an amount in excess of $75,000.00, plus interest and costs.

## COUNT II
(Breach of the Covenant of Good Faith and Fair Dealing Against NSF)

65.   Plaintiffs repeat and reallege each and every allegation contained above and incorporate the same by reference.

66.   Every contract contains an implied covenant of good faith and fair dealing.

67.   Given that every contract contains an implied covenant of good faith and fair dealing, NSF had an obligation to deal with Plaintiffs in good faith relative to the Development and Construction Loans.

68.   NSF has failed and refused, and continues to fail and refuse, to deal in good faith with Plaintiffs by failing to honor its commitment(s) and obligation(s) under the Development Loan by refusing to apply monies from the "interest reserve" towards payment of amounts due by Steptoe from the Development Loan, and/or otherwise failing or refusing to honor its commitment(s) to Steptoe under both the Development and the Construction Loans.

69.   As a result of the foregoing conduct, NSF breached the covenant of good faith and fair dealing.

70.   As a direct and proximate result of NSF's breach, Plaintiffs have been damaged in an amount in excess of $75,000.00, plus interest thereon.

71.   As a direct and proximate result of NSF's breach, any remaining performance by the Plaintiffs relative to the Development and Construction Loans has been excused or prevented.

72.   Plaintiffs have been forced to retain the services of an attorney to prosecute this matter and are entitled to receive reasonable costs and attorney's fees incurred herein as special damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demand judgment against NSF; Beal, as successor-in-interest to NSF; and FDIC, as receiver of NSF, and Plaintiffs demand compensatory damages in an amount in excess of $75,000.00, plus interest and costs.

## COUNT III
### (Fraudulent/Negligent Inducement Against NSF)

73.    Plaintiffs repeat and reallege each and every allegation contained above and incorporate the same by reference.

74.    NSF made fraudulent/negligent misrepresentations which induced the Plaintiffs into pledging the Additional Collateral.

75.    Specifically, Plaintiffs would not have pledged the Additional Collateral to NSF as part of the Second Modification had NSF not told Plaintiffs that it would fund the loans or had NSF disclosed its financial difficulties, and/or Silverton's failure as a participant lender, and/or that the federal government was investigating its lending practices, and/or that NSF was in danger of being closed.  Instead, Plaintiffs would have sought additional and/or replacement financing from a stable financial institution able to honor its lending commitments.

76.    Further, Plaintiffs would not have entered into the Construction Loan or pledged the Additional Collateral as part thereof, had NSF not told Plaintiffs that it would fund the loans or had NSF disclosed its financial difficulties, and/or Silverton's failure as a participant lender, and/or that the federal government was investigating its lending practices, and/or that NSF was in danger of being closed.  Instead, Plaintiffs would have sought additional and/or replacement financing from a stable financial institution able to honor its lending commitments.

77.   Plaintiffs reasonably relied upon the misrepresentations by NSF and have suffered damages as a proximate consequence of NSF's misrepresentation.

78.   Upon information and belief, NSF knew or should have known of its imminent failure, knew or should have known of its subsequent takeover by the OTS/FDIC, and knew of Silverton's failure as a participant lender, when it induced Plaintiffs to enter into Second Modification, and induced Plaintiffs to enter into the Construction Loan, and induced Plaintiffs to pledge the Additional Collateral.

79.   As a direct result of the conduct of NSF in fraudulently and/or negligently inducing Plaintiffs to enter into the Second Modification, and enter into the Construction Loan, and to pledge the Additional Collateral, and with actual or presumed knowledge of its and Silverton's imminent failure, Plaintiffs face additional liability as a result of the Development and Construction Loans, and are likely to lose their ownership interests in the Additional Collateral securing those Loans.

80.   Despite NSF's assertions just prior to imminent failure that the value of the underlying collateral for the Development Loan was rendered insufficient due to changed market conditions in the six months between the January 29, 2009, Second Modification, and NSF's July 2009 notice that it was cancelling funding commitments to Steptoe, NSF has failed to present any support to its contention – which appears to have been no more than a fabricated cause for declaring the Development Loan in default and denying Steptoe of the benefits of the "interest reserve" on the eve of NSF's imminent failure.

81.   Despite NSF's assertions just prior to imminent failure that the value of the underlying collateral for the Construction Loan was rendered

insufficient due to changed market conditions in the four months between the March 31, 2009, Construction Loan and NSF's July 2009 notice that it was cancelling funding commitments to Steptoe, NSF has failed to present any support to its contention – which appears to have been no more than a fabricated cause for declaring the Construction Loan in default.

82.     As a direct and proximate result of NSF's actions, neither the Development and Construction Loans, nor any guaranty executed in furtherance thereof, is enforceable against the Plaintiffs.

83.     As a direct and proximate result of NSF's actions, Plaintiffs have been damaged in an amount in excess of $75,000.00, plus interest thereon.

84.     Plaintiffs have been forced to retain the services of an attorney to prosecute this matter and are entitled to receive reasonable costs and attorneys fees incurred herein as special damages.

WHEREFORE, PREMISES CONSIDERED, plaintiffs demand judgment against NSF; Beal, as successor-in-interest to NSF; and FDIC, as receiver of NSF, and plaintiffs demand compensatory and punitive damages in an amount in excess of $75,000.00, plus interest and costs.

## COUNT IV
(Fraud/Deceit)

85.     Plaintiffs repeat and reallege each and every allegation contained above and incorporate the same by reference.

86.     NSF intentionally, recklessly and/or mistakenly misrepresented specific facts to Plaintiffs which were reasonably relied upon by the Plaintiffs to their detriment.

87.   Specifically NSF intentionally, recklessly and/or mistakenly misrepresented specific facts to Plaintiffs which induced the Plaintiffs into pledging the Additional Collateral.

88.   Plaintiffs would not have pledged the Additional Collateral to NSF as part of the Second Modification had NSF disclosed its financial difficulties, and/or Silverton's failure as a participant lender, and/or that the federal government was investigating its lending practices, and/or that NSF was in danger of being closed.   Instead, Plaintiffs would have sought additional and/or replacement financing from a stable financial institution able to honor its lending commitments.

89.   Further, Plaintiffs would not have entered into the Construction Loan, and pledged the Additional Collateral as part thereof, had NSF disclosed its financial difficulties, and/or Silverton's failure as a participant lender, and/or that the federal government was investigating its lending practices, and/or that NSF was in danger of being closed. Instead, Plaintiffs would have sought additional and/or replacement financing from a stable financial institution able to honor its lending commitments.

90.   As a direct and proximate result of NSF's actions, neither the Development and Construction Loans, nor any guaranty executed in furtherance thereof, is enforceable against the Plaintiffs.

91.   Plaintiffs reasonably relied upon the fraudulent misrepresentations of NSF and have suffered damages as a proximate consequence of NSF's misrepresentation.

92.   As a direct and proximate result of NSF's actions, Plaintiffs have been damaged in an amount in excess of $75,000.00, plus interest thereon.

93.     As a direct and proximate result of the fraud and deceit of NSF, neither the Loan nor the Guaranty is enforceable against the Plaintiffs.

94.     Plaintiffs have been forced to retain the services of an attorney to prosecute this matter and are entitled to receive reasonable costs and attorneys fees incurred herein as special damages.

WHEREFORE, PREMISES CONSIDERED, plaintiffs demand judgment against NSF; Beal, as successor-in-interest to NSF; and FDIC, as receiver of NSF, and plaintiffs demand compensatory and punitive damages in an amount in excess of $75,000.00, plus interest and costs.

## COUNT V
(Suppression/Concealment)

95.     Plaintiffs repeat and re-allege each and every allegation set forth above and incorporate the same herein.

96.     NSF suppressed, concealed, hid and withheld from Plaintiffs material and important facts regarding the financial condition and difficulties of NSF and Silverton, including that the federal government was investigating NSF's and Silverton's lending practices, that NSF and Silverton were in danger of being closed, and that NSF may not honor or fully fund the Development and Construction Loans despite NSF's contractual obligations and representations to Plaintiffs.

97.     The Plaintiffs did not know these material and important facts.

98.     NSF had a duty to make known to Plaintiffs these material and important facts.

99.     The Plaintiffs relied upon NSF's suppression of these material and important facts.

100.  Based upon NSF's suppression and concealment of these material and important facts, Plaintiffs face continuing liability due to third-party contractual obligations and the potential loss of the Additional Collateral.

101.  As a direct and proximate result of NSF's actions, Plaintiffs have been damaged in an amount in excess of $75,000.00, plus interest thereon.

102.  As a direct and proximate result of NSF's actions, neither the Development and Construction Loans, nor any guaranty executed in furtherance thereof, is enforceable against the Plaintiffs.

103.  Plaintiffs have been forced to retain the services of an attorney to prosecute this matter and are entitled to receive reasonable costs and attorneys fees incurred herein as special damages.

WHEREFORE, PREMISES CONSIDERED, plaintiffs demand judgment against NSF; Beal, as successor-in-interest to NSF; and FDIC, as receiver of NSF, and plaintiffs demand compensatory and punitive damages in an amount in excess of $75,000.00, plus interest and costs.

## COUNT VI
### (Declaratory Relief Against All Defendants)

104.  Plaintiffs repeat and re-allege each and every allegation set forth above and incorporate the same herein.

105.  As set forth above, NSF made fraudulent/negligent misrepresentations which induced the Plaintiffs into loan agreements and the pledging of collateral in reliance upon the loan agreements absent sufficient funding.

106.   Upon information and belief, NSF knew or should have known of its imminent failure, knew or should have known of its subsequent takeover by the OTS/FDIC, and knew of Silverton's failure as a participant lender, when it induced Plaintiffs to enter into Second Modification, and induced Plaintiffs to enter into the Construction Loan, and induced Plaintiffs to pledge the Additional Collateral.

107.   As a direct result of the conduct of NSF in fraudulently and negligently inducing Plaintiffs to enter into the Second Modification, and enter into the Construction Loan, and to pledge the Additional Collateral, and with actual or presumed knowledge of its and Silverton's imminent failure, Plaintiffs face additional liability as a result of the Development and Construction Loans, and are likely to lose their ownership interests in the Additional Collateral securing those Loans.

108.   Despite NSF's assertions just prior to imminent failure that the value of the underlying collateral for the Development Loan was rendered insufficient due to changed market conditions in the six months between the January 29, 2009, Second Modification, and NSF's July 2009 notice that it was cancelling funding commitments to Steptoe, NSF has failed to present any support to its contention – which appears to have been no more than a fabricated cause for declaring the Development Loan in default and denying Steptoe of the benefits of the "interest reserve" on the eve of NSF's imminent failure.

109.   Despite NSF's assertions just prior to imminent failure that the value of the underlying collateral for the Construction Loan was rendered insufficient due to changed market conditions in the four months between the March 31, 2009, Construction Loan and NSF's July 2009 notice that it was cancelling funding commitments to Steptoe, NSF has failed to present

any support to its contention – which appears to have been no more than a fabricated cause for declaring the Construction Loan in default.

110.   By reason of the above, an actual and justiciable controversy has arisen and exists between the parties necessitating a declaration from this honorable Court as to their respective rights and other legal relations.

111.   Based upon the foregoing, the Plaintiffs are entitled to a declaration that Plaintiffs' collateral pledged as security for the Development and Construction Loans was encumbered by NSF based upon fraudulent and/or negligent misrepresentations and/or the suppression of facts that NSF had a duty to disclose, and that Plaintiffs' collateral is therefore released from securing the Development and Construction Loans.

112.   Plaintiff are further entitled to a declaration that as a result of NSF's conduct and misrepresentations and suppression of information, any remaining performance by Plaintiffs under the Development and Construction Loans, or any guaranty executed in furtherance thereof, must be excused or prevented and neither the obligations or requirements of the Development and Construction Loans, nor any guaranty executed in furtherance thereof, is enforceable against the Plaintiffs, thus extinguishing any liability to Beal as the successor in interest to NSF.

113.   Plaintiffs have been forced to retain the services of an attorney to prosecute this matter and are entitled to receive reasonable costs and attorney's fees incurred herein as special damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray as follows:

1.     For and award of compensatory, punitive, exemplary, general, consequential, and/or special damages in excess of $75,000.00;

2.     For a declaration that that Plaintiffs' collateral pledged as security for the Development and Construction Loans was encumbered by NSF based upon fraudulent and/or negligent misrepresentations or the suppression of information, and that Plaintiffs' collateral is therefore released from securing the Development and Construction Loans.

3.     For a declaration that that as a result of NSF's conduct and misrepresentations and suppression of information, any remaining performance by Plaintiffs under the Development and Construction Loans, or any guaranty executed in furtherance thereof, must be excused or prevented and neither the obligations or requirements of the Development and Construction Loans, nor any guaranty executed in furtherance thereof, is enforceable against the Plaintiffs, thus extinguishing any liability to Beal as the successor in interest to NSF.

4.     For all lost profits and the value of all lost opportunities.

5.     For all other costs and fees incurred herein as damages and pursuant to the express terms of the agreements between the parties;

6.     For interest; and

7.     For such other relief as the Court may deem just and necessary.

Dated this ___ day of October, 2010.

Respectfully submitted,

_J. Scott Dickens (ASB-6823-N74J)_
Attorney for Plaintiffs


Amber   M.   Whillock   (ASB-0816-
R79W)
Attorney for Plaintiffs


OF COUNSEL:
STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
P.O. Box 598512
Birmingham, AL  35259-8512
Telephone: (205) 868-6000
Facsimile: (205) 868-6099

SERVE ALL DEFENDANTS BY CERTIFIED MAIL AT THE
ADDRESSES BELOW:

New South Federal Savings Bank
c/o Federal Deposit Insurance Corporation
Dennis Elston, Agent for Service of Process
Shelby Office
1 Riverchase Office Plaza, Suite 110
Birmingham, Alabama 35244

New South Federal Savings Bank
c/o Beal Bank, SSB
2000 Crestwood Blvd.
Birmingham, AL  35210

Beal Bank, SSB
c/o C T Corporation System
350 N. St. Paul Street, Suite 2900
Dallas, Texas 75201-4234

Federal Deposit Insurance Corporation
c/o Dennis Elston, Agent for Service of Process
Shelby Office
1 Riverchase Office Plaza, Suite 110
Birmingham, Alabama 35244